## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

LANISA ALEXANDER,

        Plaintiff,

vs.

COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

CASE NO. 1:22-cv-00643

MAGISTRATE JUDGE AMANDA M. KNAPP

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lanisa Alexander ("Plaintiff" or "Ms. Alexander") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). (ECF Doc. 1.)  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the case is before the undersigned pursuant to the consent of the parties. (ECF Doc. 7.)  For the reasons set forth below, the Court **AFFIRMS** the Commissioner's decision.

### I.    Procedural History

Ms. Alexander filed her applications for DIB and SSI on July 17, 2020. (Tr. 16, 64, 65, 183-84, 185-91.)  She asserted a disability onset date of January 1, 2015. (Tr. 16, 64, 65, 183, 185.)  She alleged disability due to depression, anxiety, diabetes, asthma, scoliosis, and arthritis in the hands and knee. (Tr. 66, 68, 108, 125, 215.)  Her applications were denied at the initial level (Tr. 16, 104-13) and upon reconsideration (Tr. 16, 121-28).  Ms. Alexander requested a

1

hearing.  (Tr. 129-30.)  A telephonic hearing was held before an Administrative Law Judge

("ALJ") on May 6, 2021.  (Tr. 34-45.)

The ALJ issued an unfavorable decision on May 20, 2021, finding Ms. Alexander had not

been under a disability from November 21, 2017 through the date of the decision.[1]  (Tr. 13-33.)

The Appeals Council denied Ms. Alexander's request for review on March 24, 2022, making the

ALJ's decision the final decision of the Commissioner.  (Tr. 1-6.)  Ms. Alexander then filed the

pending appeal (ECF Doc. 1), which is fully briefed (ECF Docs. 12, 13).

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Ms. Alexander was born in 1970.  (Tr. 28, 183.)  She has a high school education (Tr. 28,

216) and worked as home health care aide (Tr. 27, 216).

### B.    Medical Evidence

Although Ms. Alexander has physical and mental impairments that were identified by the

ALJ, she only challenges the ALJ decision regarding her severe physical impairment "arthritic

changes of hands and knees."  (Tr. 19; ECF Doc. 12, pp. 13-14.)  The evidence summarized

herein is accordingly focused on the evidence pertaining to those impairments.

#### 1.    Treatment History

On May 2, 2019, Ms. Alexander had x-rays of her knees and hands.  (Tr. 275-77.)  The

left-hand x-ray showed moderate to severe osteoarthritis at the first carpometacarpal (CMC)

joint, mild at the triscaphe and second CMC joints, with mild joint space narrowing at the fourth

---

[1] The ALJ explained that Ms. Alexander had filed prior applications for DIB and SSI, alleging disability since January 1, 2013, which were denied on November 20, 2017.  (Tr. 16-17.)  Ms. Alexander had also filed applications on May 18, 2018, which were denied on November 4, 2019, but an appeal from the November 2019 decision was pending at the district court level at the time of the ALJ's May 20, 2021 decision.  (Tr. 17.)

2

and fifth proximal interphalangeal (PIP) and fifth distal interphalangeal (DIP) joints.  (Tr. 276.)
The right-hand x-ray showed mild osteoarthritis at the first and second CMC joints and at the
second through fifth DIP joints.  (*Id*.)  The left-knee x-ray showed: moderate to severe medial
compartment joint space narrowing; moderate medial and mild lateral compartment
osteophytosis; and a small intra-articular loose body in the popliteal joint recess.  (Tr. 277.)  The
right-knee x-ray showed moderate to severe medial joint space narrowing bilaterally with a mild
osteophytosis in the medial and lateral compartments.  (*Id*.)

On August 1, 2019, Ms. Alexander presented to Patricia Travis, CNP, at the Cleveland
Clinic regarding her lumbar degenerative disc disease and osteoarthritis of the hands and knees.
(Tr. 273-80.)  CNP Travis noted prior diagnoses of bilateral chronic knee pain due to
osteoarthritis and osteoarthritis at the first CMC joint.  (Tr. 273.)  Physical therapy ("PT") had
been recommended for Ms. Alexander's knees and occupational therapy ("OT") had been
recommended for arthritis in her hands.  (*Id*.)  She had scheduled PT, but had not started; she had
not yet scheduled OT.  (Tr. 274.)  She was using Voltaren gel on her hands and knees, lidocaine
patches on her knees and back, and was taking gabapentin.  (Tr. 274.)  She had not tried steroid
injections.  (Tr. 273.)  She reported: early morning stiffness for ten minutes; pain in her knee
joints, greater on the left; pain in the first CMC joint, greater on the left; and numbness and
weakness in her hands.  (Tr. 274.)  She also reported poor sleep and afternoon fatigue at times.
(*Id*.)  On examination, CNP Travis noted tenderness in the first CMC joint, mild tenderness in
the bilateral knee joints, and bilateral knee crepitus.  (Tr. 279.)  Otherwise, she observed good
active range of motion, no joint swelling, and a normal gait without an assistive device.  (*Id*.)
CNP Travis diagnosed osteoarthritis in both knees, bilateral chronic knee pain, and osteoarthritis
of the first CMC joint in the right hand.  (*Id*.)  She recommended that Ms. Alexander keep her PT

3

appointment, schedule an OT appointment, try Celebrex in place of naproxen, and continue topical remedies. (Tr. 279-80.)  CNP Travis noted that gel injections in the knees would be considered if needed, but steroid injections should be avoided due to Ms. Alexander's diabetes mellitus.  (Tr. 280.)

Ms. Alexander attended physical and occupational therapy appointments in August and September 2019. (Tr. 381-383, 384-86, 386-92, 394-97).  At her initial PT assessment on August 15, 2019, she reported difficulty rising from a chair, standing, walking, stair negotiation, bending, and sleeping.  (Tr. 394-95.)  Physical examination findings included, intermittent numbness in the hands and feet, reduced active range of motion in the knees, and reduced lower extremity strength, but with a notation that it was difficult to accurately assess strength in the right lower extremity due to knee pain. (Tr. 396.)  Ms. Alexander's gait on the left lower extremity was mildly antalgic.  (*Id.*)  She could not tolerate a sit to stand test due to wrist and knee pain.  (*Id.*)  She also had difficulty completing exercises during the session because she was caring for a toddler grandchild during the session.  (Tr. 397.)  Aquatic therapy was recommended at the next visit due to Ms. Alexander's poor tolerance for land exercise.  (Tr. 394, 395, 397.)

Ms. Alexander presented for aquatic therapy on August 28, 2019.  (Tr. 390-92.)  She reported that she had fallen over the weekend after stepping off a curb.  (Tr. 390.)  She reported pain in her left knee and ankle with mild edema and no ecchymosis, but reported she was starting to feel better since the fall.  (*Id.*)  She demonstrated continued bilateral knee pain with a mild decrease in pain following aquatic exercises.  (*Id.*)  Her gait was antalgic.  (*Id.*)  Ms. Alexander also presented for her first occupational therapy session on August 28, 2019, for wrist and thumb pain and reduced strength.  (Tr. 386-90.)  She reported that her goal was "to be able to use [her] hands to do everyday things." (Tr. 388.)  On examination, sensation to light touch was grossly

4

intact in Ms. Alexander's upper extremities and she denied tingling or numbness. (*Id.*) Mild edema was observed in her wrists. (*Id.*) Her active range of motion in the elbows, wrists, hands, and thumbs was within functional limits. (*Id.*) There was some reduced strength in the upper extremities. (Tr. 389.) She was provided instructions on stretching exercises for her wrists and fingers, CMC splints for her hands, compression sleeves for her hands/forearms, and instructions on how to protect her joints when carrying and lifting items. (Tr. 390.) She was encouraged to avoid excessive sustained grip with twisting. (*Id.*)

Ms. Alexander presented to aquatic therapy on September 4, 2019. (Tr. 384-86.) She reported aquatic exercise was beneficial and that her left knee and ankle were feeling better, but said that knee pain on the left (more than right) was limiting her mobility. (Tr. 384.) Her gait on the left lower extremity was antalgic. (Tr. 385.) Ms. Alexander returned on September 18, 2019 for her second occupational therapy session. (Tr. 381-82.) She reported wrist and hand pain with reduced strength. (Tr. 381.) Examination findings were similar to her first occupational therapy session. (*Compare* Tr. 381-82 *with* Tr. 388-89.)

Ms. Alexander presented for a physical with Amy Bodnarchuk, M.D., at the Cleveland Clinic on January 14, 2020. (Tr. 376-79.) She had no acute complaints. (Tr. 376.) Dr. Bodnarchuk noted that Ms. Alexander followed with rheumatology for chronic knee, bilateral hand, and back pain, and that her last office visit was in July 2018. (*Id.*) Ms. Alexander requested ibuprofen and reported taking naproxen regularly. (*Id.*) Examination findings were normal, including normal neurological strength and grossly intact sensation. (Tr. 379.)

Ms. Alexander presented for a diabetic foot visit with Debra Thornton, DPM, at the Cleveland Clinic on January 15, 2020. (Tr. 374-75.) The skin on her lower legs and feet appeared diffusely xerotic on examination and she had mild hyperkeratotic lesions on her right

5

lateral heel and both fifth metatarsals. (Tr. 375.) She ambulated without assistance. (*Id*.) Her foot examination was normal, including normal muscle strength and full range of motion without pain or crepitus. (*Id*.) Dr. Thornton diagnosed diabetes mellitus with associated neuropathy, onychomycosis / nail anomaly, and calluses of the right heel and bilateral fifth metatarsals. (*Id.*) Ms. Alexander's toenails were debrided, her hyperkeratotic lesions were pared, and she was referred for diabetic shoes and inserts; she was instructed to return in nine weeks. (*Id.*)

On August 10, 2020, Ms. Alexander contacted Dr. Bodnarchuk's office by telephone to complain of sharp and severe right knee pain since August 6, with some swelling. (Tr. 577-78.) She reported the pain came and went, and said she might have aggravated her knee when her grandchildren were with her for a week, because of moving around with them. (Tr. 578.) She said the pain was worse if she moved around, and there were no issues when she was resting. (*Id*.) Dr. Bodnarchuk indicated that Ms. Alexander would have to come in for an evaluation before an x-ray could be ordered. (Tr. 577.) Ms. Alexander could not attend the next available appointment, which was on August 13, 2020, due to a conflict with another appointment for her child. (*Id*.) She scheduled the next available appointment, which was on September 16, 2020. (*Id*.) She was instructed to use an Ace wrap, apply ice, and rest. (*Id*.)

Ms. Alexander presented to internist Katie Shen, M.D., at the Cleveland Clinic on September 16, 2020, complaining of intermittent pain in her right knee that started acutely one week earlier. (Tr. 649.) She rated her pain at 10/10, and indicated the pain did not correlate with activity. (*Id*.) The pain was primarily in the right medial meniscus, with intermittent shooting pain towards the lateral meniscus; Ms. Alexander could not recall any trauma to her knee. (*Id*.) On examination, sensation and strength were intact in the bilateral lower extremities, but with focal tenderness to palpation along the right medial knee. (Tr. 654.) Dr. Shen diagnosed acute

6

right knee pain, likely due to medial meniscus tear or worsening osteoarthritis, improving with rest, ice, compression, and elevation.  (*Id*.)  Dr. Shen referred Ms. Alexander for a PT consult, noting that she reported PT previously helped with her left knee and back pain.  (*Id*.)

During a diabetes follow-up at the Cleveland Clinic on November 18, 2020, with endocrinologist Leann Olansky, M.D. (Tr. 773-83), Ms. Alexander complained of "[a]rthritis especially knees" (Tr. 778).  She reported no numbness, weakness, or cramping.  (*Id*.)  On examination, Dr. Olanski noted degenerative joint disease deformities in the extremities with no skin discoloration or edema.  (*Id*.)

### 2.     Opinion Evidence

#### i.     State Agency Medical Consultants

State agency medical consultant Gary Hinzman, M.D. completed a physical RFC assessment on August 20, 2020 (Tr. 70-72, 80-82), opining that Ms. Alexander had the RFC to occasionally lift and/or carry twenty pounds, frequently lift and/or carry ten pounds, stand and/or walk about six hours in an eight-hour workday, sit about six hours in an eight-hour workday, frequently push and/or pull with foot pedals bilaterally.  (Tr. 70-71, 80-81.)  Dr. Hinzman opined that Ms. Alexander required the following postural limitations: no climbing of ladders, ropes, and scaffolds; occasional stooping, kneeling, crouching, crawling, and climbing of ramps and stairs; and frequent balancing.  (Tr. 71, 81.)   Dr. Hinzman also opined that Ms. Alexander requried the following manipulative limitations: occasional reaching, handling, and fingering with the left upper extremity and frequent handling and fingering with the right upper extremity. (*Id*.)  Finally, Dr. Hinzman opined that Ms. Alexander required the following environmental limitations: avoidance of high concentrations of smoke, fumes, and pollutants and avoidance of dangerous machinery and unprotected heights.  (Tr. 71-72, 81-82.)

7

On reconsideration on October 2, 2020, state agency medical consultant Dimitri Teague, M.D. adopted the RFC findings from the prior administrative law judge decision dated November 20, 2017.  (Tr. 93, 101.)  In the prior administrative law judge decision, Ms. Alexander was found to have the residual functional capacity to perform light work, except: she could unlimitedly push and pull except as otherwise shown for lifting and carrying; she could occasionally climb ramps and stairs; she could never climb ladders, ropes, or scaffolds; she could occasionally stoop and crawl; she must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation; and she should avoid concentrated exposure to extreme cold and extreme heat and humidity.  (*Id*.)

### ii.    Physical Therapist

On April 8, 2021, physical therapist James L. McDonald, P.T., D.P.T., completed a physical capacity medical source statement. (Tr. 800-01.)  He opined Ms. Alexander could: occasionally lift/carry ten pounds; frequently lift/carry two pounds; stand/walk for a total of two hours and thirty minutes in an eight-hour workday and for fifteen minutes without interruption; sit for a total of eight hours in an eight-hour workday and for thirty minutes without interruption; never climb, balance, kneel, or crawl; rarely stoop or crouch; never pull; and occasionally reach, push and perform fine and gross manipulation.  (*Id*.)  He opined that Ms. Alexander had no environmental limitations.  (Tr. 801.)  He opined that she would need to alternate positions between sitting, standing, and walking at will.  (*Id*.)  He rated the severity of her pain moderate and opined that her pain would interfere with concentration and take her off task.  (*Id*.)  He could not opine as to whether her pain would cause absenteeism.  (*Id*.)  He opined that she would not need to elevate her legs at will and she would not need additional unscheduled rest periods outside of the standard breaks of two fifteen-minute breaks and a half-hour lunch.  (*Id*.)  PT

McDonald noted that his medical findings were based on a functional capacity evaluation ("FCE") (Tr. 800-01), but neither party provided record citations to the results of the FCE.

## C.     Hearing Testimony

### 1.     Plaintiff's Testimony

At her May 6, 2021 hearing, Ms. Alexander testified in response to questioning by the ALJ and her representative.  (Tr. 37-41.)  She testified that she had asthma and problems with her knees, hands, and back.  (Tr. 38.)  She said that she was still smoking, but she was using patches and smoking less than before.  (*Id*.)  She said that her back and knee pain limited her ability to stand or walk.  (Tr. 39.)  She estimated being able to walk from her house to her car before having to sit down and rest.  (*Id*.)  She also testified that it took her time to focus and get moving in the morning because of her back and knee pain.  (Tr. 39-40.)  Ms. Alexander testified that arthritis and neuropathy in her hands caused her difficulty using her hands.  (Tr. 40.)  She had problems picking things up and holding them for too long.  (Tr. 40.)  She had problems using her fingers and when her thumbs went numb, she could not do anything.  (*Id*.)  She reported that she could lift about five pounds.  (*Id*.)

Ms. Alexander wore braces on her knees, but she did not have a back brace.  (Tr. 40.) She reported that pain medicine prescribed for her knees, back, and hand pain did not work, and that her doctor recently referred her to an orthopedist for knee injections.  (Tr. 38.)  She said surgery had not been recommended for her knees, back, or hands.  (*Id*.)

### 2.     Vocational Expert's Testimony

A Vocational Expert ("VE") testified at the hearing.  (Tr. 41-44.)  He confirmed that Ms. Alexander's past work as a home health aide was a medium, SVP 3 (semi-skilled) job.  (Tr. 41.)

The VE testified that a hypothetical individual with Ms. Alexander's education level and past work experience and with the functional limitations described in the ALJ's RFC determination could not perform Ms. Alexander's past work as a home health aide.  (Tr. 41-42.)  The VE testified that the hypothetical individual could perform representative positions in the national economy, including cafeteria attendant, cleaner/housekeeping, and assembler of electrical accessories.  (Tr. 42-43.)  The VE further testified that there would be no jobs available if the described individual would be off task at least twenty percent of the time.  (Tr. 43.)

### III.     Standard for Disability

Under the Social Security Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1.     If the claimant is doing substantial gainful activity, he is not disabled.

2.     If the claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

10

3.      If the claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, the claimant is presumed disabled without further inquiry.

4.      If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if the claimant's impairment prevents him from doing past relevant work. If the claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5.      If the claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the Residual Functional

Capacity ("RFC") and vocational factors to perform other work available in the national

economy. *Id.*

## IV.    The ALJ's Decision

Below is a summary of the findings made by the ALJ in his May 20, 2021 decision:

1.      The claimant's request for a hearing through November 20, 2017 is dismissed as *res judicata*. For the unadjudicated period commencing November 21, 2017, the claimant meets the insured status requirements of the Social Security Act through September 30, 2020. (Tr. 19.)

2.      The claimant has not engaged in substantial gainful activity since November 21, 2017, the beginning of the unadjudicated period. (*Id.*)

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, in most instances, citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

3.      The claimant has the following severe impairments: degenerative disc disease, obesity, arthritic changes of hands and knees, fibromyalgia, diabetes mellitus with mild neuropathy, asthma with tobacco abuse, major depressive disorder, and generalized anxiety disorder.  (Tr. 19-20.)

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of the listed impairments.  (Tr. 20-22.)

5.      The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. § 404.1567(b) except no climbing of ladders, ropes, or scaffolds, or crawling; frequent balancing, handling, and fingering; occasional climbing of ramps and stairs, stooping, kneeling, and crouching no concentrated exposure to temperature extremes, humidity, or environmental pollutants beyond tobacco abuse; no exposure to hazards (for example heights, machinery, commercial driving); and mental limitation that she perform routine tasks in a low stress environment (meaning no fast pace, strict quotas, or frequent duty changes) and involving superficial interpersonal interactions with coworkers, supervisors, and the public (meaning no arbitration, negotiation, or confrontation).  (Tr. 22-27.)

6.      The claimant is unable to perform any past relevant work. (Tr. 27-28.)

7.      The claimant was born in 1970.  (Tr. 28.)  She was 47 years old, which is defined as a younger individual age 18-49, at the beginning of the unadjudicated period commencing November 21, 2017.  (*Id.*)  She subsequently changed age category to closely approaching advanced age upon her attainment of age 50 in 2020.  (*Id.*)

8.      The claimant has at least a high school education.  (*Id.*)

9.      Transferability of job skills is not material to the determination of disability because claimant's past relevant work is unskilled.  (*Id.*)

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant number in the national economy that she can perform such as cafeteria attendant, housekeeping cleaner, and assembler of electrical accessories.  (Tr. 28-29.)

Based on the foregoing, the ALJ determined that Ms. Alexander had not been under a disability at any time during the unadjudicated period commencing November 21, 2017 through the date last insured of September 30, 2020 and through the date of the decision.  (Tr. 29.)

12

## V.  Plaintiff's Arguments

Ms. Alexander argues that the ALJ failed to adequately evaluate her statements regarding symptoms related to her hand and knee impairments. (ECF Doc. 12, pp. 14-16.)  She also argues that the ALJ's RFC determination lacks the support of substantial evidence and the ALJ failed to create a logical bridge between the evidence and his RFC determination.  (*Id*. at pp. 17-19.)

## VI.  Law & Analysis

### A.  Standard of Review

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  *See Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 405 (6th Cir. 2009) ("Our review of the ALJ's decision is limited to whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence.").

When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989)).  The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).  "'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the

courts.'" *Blakley*, 581 F.3d at 406 (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)).

Therefore, a court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide

questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). Even if

substantial evidence supports a claimant's position, a reviewing court cannot overturn the

Commissioner's decision "so long as substantial evidence also supports the conclusion reached

by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Although an ALJ decision may be supported by substantial evidence, the Sixth Circuit

has explained that the "'decision of the Commissioner will not be upheld where the SSA fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'" *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 651

(6th Cir. 2009) (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007) (citing

*Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-547 (6th Cir. 2004))). A decision will also not

be upheld where the Commissioner's reasoning does not "build an accurate and logical bridge

between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio

2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)).

**B.** **First Assignment of Error: Whether ALJ Erred in Evaluating Ms. Alexander's Subjective Statements Regarding Her Symptoms**

Ms. Alexander argues that the ALJ did not adequately evaluate her subjective statements

regarding the disabling nature of her hand and knee impairments. (ECF Doc. 12, pp. 14-16.)

Under the two-step process used to assess the limiting effects of a claimant's symptoms,

a determination is first made as to whether there is an underlying medically determinable

impairment that could reasonably be expected to produce the claimant's symptoms. *See* SSR 16-

3p, 82 Fed Reg. 49462, 49463; *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007)

14

(citing 20 C.F.R. § 416.929(a)).  If that requirement is met, the second step is to evaluate of the intensity and persistence of the claimant's symptoms to determine the extent to which they limit the claimant's ability to perform work-related activities.  *See* SSR 16-3p, 82 Fed Reg. 49462, 49463; *Rogers*, 486 F.3d at 247.  There is no dispute that the first step is met in this case (Tr. 23), so the discussion will be focused on the ALJ's compliance with the second step.

When the alleged symptom is pain, an ALJ should evaluate the severity of the alleged pain in light of all relevant evidence, including the factors set out in 20 C.F.R. § 404.1529(c). *See Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir. 1994).  Factors relevant to a claimant's symptoms include daily activities, types and effectiveness of medications, treatment received to address symptoms, and other factors concerning a claimant's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 82 Fed. Reg. 49462, 49465-49466; 20 C.F.R. § 404.1529(c)(3).

Here, a review of the decision reveals that the ALJ considered the entire record, based his findings on multiple relevant factors, and provided "specific reasons for the weight given to the individual's symptoms," SSR 16-3p, 82 Fed Reg. 49462, 49467.  Specifically, the ALJ acknowledged that Ms. Alexander alleged "disability due to, depression, anxiety, diabetes, asthma, scoliosis and arthritis of the hands and knees," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the objective evidence of record and other evidence[.]" (Tr. 23.)

Ms. Alexander argues that the ALJ should have found her subjective statements more consistent with the evidence of record because diagnostic testing showed she had:

> *moderate to severe* osteoarthritis in the first CMC joint of her left hand with mild osteoarthritis throughout the other aspects of her left hand and right hand, and

15

> *moderate to severe* medial joint space narrowing in her knees, bilaterally, consistent with osteoarthritis

(ECF Doc. 12, p. 15 (emphasis in original)); and because examination findings showed:

> tenderness of [her] CMC joints with some edema in the wrist area, reduced grip, pinch and strength of her left upper extremity, intermittent numbness of her hands and feet, tenderness and crepitus in her knees bilaterally, decreased knee flexion (worse on the left), difficulty assessing bilateral knee strength due to pain, a deviated gait with antalgia of the left lower extremity, an inability to tolerate the sit-to-stand test due to wrist and knee pain.

(*id.* (citing Tr. 279, 385, 388-89, 396, 654)).

Consistent with those same diagnostic tests and examination findings, the ALJ offered the following rationale for finding Ms. Alexander's statements regarding her symptoms were not entirely consistent with the evidence:

> [T]he claimant was diagnosed with diabetes, without complication and no diabetic retinopathy []. However, some neuropathy was noted []. On examination, her protective sensation was intact, pulses normal, strength full, and there was full range of motion in the ankle joint with no edema []. Muscle strength was intact, and there was full range of motion of the ankle without pain.
>
> \*\*\*
>
> The claimant has developed some hand pain since the prior decision and imaging of the left hand in May 2019 showed moderate to severe osteoarthritis at the first CMC and mild at the triscaphe and second CMC joints []. There was mild fourth and fifth PIP and fifth DIP joint space narrowing. Imaging of the right hand showed osteoarthritis, mild at the first and second CMC and at the second through fifth DIP joints. Follow-up treatment records document tenderness of the 1st CMCs []. Occupational therapy treatment notes from September 2019 note mild edema of the wrist and slightly reduced strength in the upper extremities bilaterally; however, range of motion and sensation were intact.
>
> The claimant also continues to experience knee pain and imaging of the right knee in May 2019 showed moderate to severe medial joint space narrowing. There was mild osteophytosis of the medial and lateral compartments with no erosive findings or joint effusion. Imagining of the left knee showed moderate to severe medial compartment joint space narrowing with maintained joint spaces otherwise, and moderate medial and mild lateral compartment osteophytosis, but no erosion, other destruction, or joint effusion. On examination in August 2019, there was crepitus

16

and tenderness of the knees bilaterally with good range of motion otherwise []. Her gait was also normal. Physical therapy records from the following month document a slight decrease in knee pain, but an antalgic gait [].

In January 2020, the claimant continued to report knee, hand, and back pain []. However, treatment records document full strength and intact sensation []. Follow-up treatment records document tenderness in the right knee, but sensation and motor strength were intact in the lower extremities bilaterally [].

(Tr. 23-24 (emphasis added) (citations omitted).)  Thus, the ALJ considered that there were some moderate to severe diagnostic findings in the knees bilaterally and at the first CMC in the left hand, but also that there were other normal, mild, and moderate findings.  (*Id.*)  As the regulations require, the ALJ weighed all of the objective evidence in determining that Ms. Alexander's subjective statements were not wholly consistent with the evidentiary record.

Considering the objective findings discussed above, Ms. Alexander notes that state agency medical consultant Dr. Hinzman and PT McDonald both opined that she was limited to occasional use of her left upper extremity.  (ECF Doc. 12, p. 16 (citing Tr. 71, 81, 801).)  She characterizes those opinions as "findings that [her] statements regarding her symptoms were fully consistent with the evidence."  (*Id.*)  And because the ALJ did not adopt an RFC limiting her to the occasional use of her left upper extremity, Ms. Alexander argues it was "legal error" for the ALJ to find, "contrary to the opinion evidence, that [Ms. Alexander's] allegations were out of proportion to the medical evidence."  (*Id.*)

As discussed more fully in Section VI.C., *infra*, state agency medical consultant Dr. Hinzman did offer a medical opinion that Ms. Alexander was capable of occasional use of her left upper extremity for reaching, handling, and fingering (and frequent use of her right upper extremity) (Tr. 71, 81) and PT McDonald did opine that she was capable of occasional reaching, pushing, and manipulation with both upper extremities (Tr. 801).  But state agency medical

17

consultant Dr. Teague opined, to the contrary, that Ms. Alexander did not require any limitations in the use of her upper extremities.  (Tr. 93, 101.)

In considering the two state agency opinions, the ALJ found neither opinion was fully persuasive.  (Tr. 25.)  He explained that "new and material evidence of additional severe limitations" required "somewhat greater physical limitations" than those adopted in the prior ALJ decision, including: "edema of the wrist and tenderness in the knee," which precluded crawling and limited her to frequent balancing; and "osteoarthritis of the hands with slightly reduced strength in the upper extremities," which merited a limitation to frequent handling and fingering.  (Tr. 25-26.)  However, the ALJ explicitly concluded that the objective evidence did not support further changes to Ms. Alexander's RFC since the prior ALJ decision.  (Tr. 26.)

As to PT McDonald, the ALJ found his opinion was not persuasive because it was "not well supported" and was "inconsistent with the weight of the objective evidence of record."  (Tr. 25.)  In particular, the ALJ found the objective findings in Ms. Alexander's treatment records did not support the "extreme limitations" in PT McDonald's opinion, explaining:

> For example, while treatment records document osteoarthritis of the hand and knee joints, mild edema of the wrist, and slightly reduced strength in the upper extremities bilaterally, range of motion and sensation were intact. There was crepitus and tenderness of the knees bilaterally, but good range of motion otherwise and her gait was generally normal. Sensation and motor strength were also intact in the lower extremities bilaterally.

(*Id.*)  Thus, the ALJ clearly explained why he only adopted some of the new RFC limitations proposed in Dr. Hinzman's opinion, and why he rejected the "extreme" limitations in PT McDonald's opinion, specifically basing his findings on the objective evidence in the record.

Ultimately, Ms. Alexander is asking this Court to reconsider the evidence that was already considered and weighed by the ALJ.  But it is not this Court's role to "try the case *de*

18

*novo*, . . . resolve conflicts in evidence, []or decide questions of credibility." *Garner*, 745 F.2d at 387.  Instead, this Court's role is to determine whether the ALJ's findings were supported by substantial evidence.  Even if substantial evidence supported Ms. Alexander's interpretation of the evidence, this Court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477.

A review of the ALJ decision reveals that his analysis of Ms. Alexander's subjective complaints was supported by substantial evidence.  In addition to the diagnostic imaging, examination findings, and medical opinions discussed above, the ALJ also considered the fact that surgery was not recommended (Tr. 23), and evidence that Ms. Alexander cared for her niece, who had special needs, and babysat her grandchildren (Tr. 24, 25, 440, 490).  Given the complete evidentiary record and the ALJ's thorough consideration of the evidence, this Court cannot find that his findings regarding Ms. Alexander's subjective symptoms lacked the support of substantial evidence.

For the reasons set forth above, the Court finds the ALJ was supported by substantial evidence in finding Ms. Alexander's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely consistent with the evidence of record.  Accordingly, the Court finds Ms. Alexander's first assignment of error to be without merit.

**C.     Second Assignment of Error: Whether RFC is Supported by Substantial Evidence**

Ms. Alexander next asserts that the RFC was not supported by substantial evidence because the ALJ improperly rejected medical opinions and determined the RFC based on his own interpretation of the medical evidence; she further argues that there is no logical bridge between the evidence and the RFC determination. (ECF Doc. 12, pp. 16, 17-19.)

An ALJ is charged with determining a claimant's RFC based on all the relevant evidence in the claimant's record.  *See* 20 C.F.R. §§ 404.1545(a)(1); 404.1546(c); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009).  That includes medical opinion evidence.  Nevertheless, the ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding."  *Poe*, 342 F. App'x at 157; *see also Modro v. Comm'r of Soc. Sec.*, No. 2:18-CV-900, 2019 WL 1986522, at *7 (S.D. Ohio May 6, 2019), *report and recommendation adopted,* No. 2:18-CV-900, 2019 WL 2437296 (S.D. Ohio June 11, 2019).

Here, consistent with the regulations, the ALJ evaluated the evidence (Tr. 23-27) and assessed Ms. Alexander's RFC, finding that she had the physical RFC to perform light work with additional limitations of: "no climbing of ladders, ropes, or scaffolds, or crawling; frequent balancing, handling, and fingering; occasional climbing of ramps and stairs, stooping, kneeling, and crouching; concentrated exposure to temperature extremes, humidity, or environmental pollutants beyond tobacco abuse; [and] no exposure to hazards (for example heights, machinery, commercial driving)" (Tr. 22).

Ms. Alexander asserts that the RFC is not supported by substantial evidence because the ALJ improperly relied on his own interpretation of the evidence rather than adopting the opinions of state agency medical consultant Dr. Hinzman and PT McDonald limiting her to occasional use of her left upper extremity for reaching, handling, and fingering.  (ECF Doc. 12, pp. 16, 17-19.)  She also contends that the RFC is not supported by substantial evidence because there is no logical bridge between evidence showing "moderate to severe osteoarthritis" in the left upper extremity and "moderate to severe osteoarthritis in both knees" and the ALJ's determination that she could perform light work with "no restrictions beyond frequent balancing, handling and fingering and no crawling."  (*Id*.)

20

The Social Security Administration's ("SSA") regulations for evaluating medical opinion evidence require ALJs to evaluate the "persuasiveness" of medical opinions "using the factors listed in paragraphs (c)(1) through (c)(5)" of the regulation.  20 C.F.R. § 404.1520c(a); *see Jones v. Comm'r of Soc. Sec.*, No. 3:19-CV-01102, 2020 WL 1703735, at *2 (N.D. Ohio Apr. 8, 2020). The five factors to be considered are supportability, consistency, relationship with the claimant, specialization, and other factors.  20 C.F.R. § 404.1520c(c)(1)-(5).  The most important factors are supportability and consistency.  20 C.F.R. §§ 405.1520c(a), 404.1520c(b)(2).  ALJs must explain how they considered consistency and supportability, but need not explain how they considered the other factors.  20 C.F.R. § 404.1520c(b)(2).

Here, the ALJ considered and evaluated the opinions of the state agency medical consultants Drs. Hinzman and Teague and the opinion of PT McDonald.  (Tr. 25-26.)  The ALJ evaluated PT McDonald's opinion as follows:

> The undersigned has considered the medical opinions of record in rendering this decision. Physical therapist, James McDonald, DPT, completed a questionnaire on April 8, 2021 (Exhibit C16F). Mr. McDonald concluded that the claimant can lift/carry ten pounds occasionally and two pounds frequently, walk occasionally, stand fifteen minutes at a time and two and a half hours total, and sit thirty minutes and two hours total. She can never climb, balance, kneel or crawl and rarely stoop and crouch. He also concluded that the claimant can occasionally reach, push, and perform fine and gross manipulation, but never pull.
>
> The undersigned does not find the opinions of Mr. McDonald persuasive as they are not well supported and are inconsistent with the weight of the objective evidence of record. For example, while treatment records document osteoarthritis of the hand and knee joints, mild edema of the wrist, and slightly reduced strength in the upper extremities bilaterally, range of motion and sensation were intact. There was crepitus and tenderness of the knees bilaterally, but good range of motion otherwise and her gait was generally normal. Sensation and motor strength were also intact in the lower extremities bilaterally. These findings do not support such extreme limitations.

(Tr. 25 (emphasis added).)  With respect to the opinions of the state agency medical consultants,

the ALJ explained:

> Gary Hinzman, M.D., evaluated the claimant's physical condition based on the evidence of record without examining the claimant on behalf of the DDD on August 20, 2020 (Exhibit C4A). <u>Dr. Hinzman concluded</u> that the claimant is capable of light exertion work with occasional climbing of ramps/stairs, no climbing of ladders/ropes/scaffolds, and occasional stooping, kneeling, crouching, or crawling. <u>The claimant can also occasionally use her left upper extremity for reaching, handling, and fingering</u>. She can frequently use the right upper extremity for reaching, handling, and fingering. Finally, she must avoid high concentrations of smoke, fumes, and pollutants and all exposure to dangerous machinery and unprotected heights. Dimitri Teague, M.D., also evaluated the claimant's physical condition based on the evidence of record without examining the claimant on behalf of the DDD on October 2, 2020 (Exhibit C8A). <u>Dr. Teague adopted the residual functional capacity of the prior ALJ decision</u> and concluded that the claimant is able to perform light work and occasionally climb ramps and stairs, but never climb ladders, ropes or scaffolds. The claimant can occasionally stoop and crawl, but must avoid concentrated exposure to fumes, odors, dust, gases, and poor ventilation and should avoid concentered exposure to extreme cold, extreme heat, and humidity.
>
> <u>The undersigned does not find the opinions of the evaluating sources fully persuasive and does not fully adopt the residual functional capacity of the prior ALJ decision</u>. <u>There is new and material evidence of additional severe limitations that result in somewhat greater physical limitations</u>. For example, due to edema of the wrist and tenderness in the knees, the claimant cannot crawl and can frequently balance. In addition, there is osteoarthritis of the hands with slightly reduced strength in the upper extremities; therefore, the undersigned finds that the claimant is able to frequently hand and finger. In order to avoid exacerbation of her asthma, the claimant must avoid concentrated exposure to temperature extremes, humidity, and environmental pollutants, except for her tobacco use. <u>However, there is no objective evidence of further change in the claimant's physical residual functional capacity since the prior ALJ decision</u>.

(Tr. 25-26 (emphasis added).)

Ms. Alexander asserts that the ALJ improperly played doctor when he partially rejected

the opinions of the state agency medical consultants and rejected PT McDonald's opinion.  (ECF

Doc. 12, pp. 16, 17-18.)  This argument lacks merit.  "[T]here is no requirement that an ALJ

adopt a state agency . . . opinion[] verbatim; nor is the ALJ required to adopt the state agency . . .

22

limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015); *see also Poe*, 342 F. App'x at 157 (6th Cir. 2009) (explaining that an ALJ "is not required to recite the medical opinion of a physician verbatim in his residual functional capacity finding"). Further, the Sixth Circuit has explained: "requir[ing] [an] ALJ to base her RFC finding on a physician's opinion, would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013) (internal quotation and citation omitted).

Ultimately, the ALJ's RFC determination was sufficiently supported by the objective evidence and medical opinions.  While Dr. Hinzman and PT McDonald limited Ms. Alexander to occasional handling and fingering on the left, Dr. Teague concluded that there was no evidence to support the need for any manipulative limitations.  (*Compare* Tr. 71, 81, 801 *with* Tr. 93, 101.) As discussed in Section VI.B., *supra*, the ALJ considered and weighed the totality of the evidence, as was his responsibility, and concluded that the new and material evidence relating to Ms. Alexander's hand and knee impairments supported new limitations to no crawling, frequent balancing, and frequent handling and fingering bilaterally.  (Tr. 22, 26.)  In reaching his determination, the ALJ did not ignore the diagnostic imaging of Ms. Alexander's hands and knees from May 2019, which showed moderate to severe osteoarthritis in the left hand and in the bilateral knees.  (Tr. 23-24.)  Instead, he considered that evidence alongside other evidence, including examination findings showing: slightly reduced strength in the upper extremities bilaterally, with intact range of motion and sensation; crepitus and tenderness in the knees, but

23

with good range of motion otherwise; normal gait; and intact sensation and motor strength in the lower extremities. (Tr. 23-24, 25, 26.)

Ms. Alexander does not claim that the ALJ misstated the examination findings, nor does she identify objective evidence that was not considered by the ALJ. Instead, she argues that the ALJ's RFC finding defies "logic and common sense" because the evidence shows "moderate to severe osteoarthritis in a major joint of an individual's upper extremity" and "moderate to severe osteoarthritis in both knees." (ECF Doc. 12, p. 18.) This amounts to a request to reweigh the evidence, as the ALJ clearly considered those findings and explained the reasoning supporting his RFC. Ms. Alexander also argues that it does not make sense that an individual with "moderate to severe" osteoarthritis in one hand and "mild" osteoarthritis in the other hand would have the same manipulative limitations bilaterally, as set forth in the ALJ's finding. (*Id*.) This conclusory argument lacks merit, as a limitation to frequent use encompasses a wide range of activity between one- and two-thirds of the workday. *See* SSR 83-10, 1983-1991 Soc. Sec. Rep. Serv. 24, 1983 WL 31251, *6 (Jan. 1, 1983) ("'Frequent' means occurring from one-third to two-thirds of the time.").

"'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.'" *Blakley*, 581 F.3d at 406. Here, the ALJ found new and material evidence supported "somewhat greater physical limitations" from the prior ALJ decision and included additional RFC limitations to account for the hand and knee impairments he found supported by the record. Given the body of evidence in the record and the ALJ's thorough consideration of that evidence, this Court cannot find that the ALJ's evaluation of the medical opinion evidence or the RFC lacked the support of substantial evidence. Moreover, the Court finds the ALJ's persuasiveness findings and RFC

24

were sufficiently explained to allow meaningful review of the decision, "build[ing] an accurate and logical bridge between the evidence and the result." *Fleischer*, 774 F. Supp. 2d at 877.

For the reasons set forth above, the Court finds the RFC and persuasiveness findings were supported by substantial evidence.  Accordingly, the Court finds Ms. Alexander's second assignment of error to be without merit.

## VII.    Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

February 20, 2024                      */s/ Amanda M. Knapp*
                                       AMANDA M. KNAPP
                                       UNITED STATES MAGISTRATE JUDGE

25